FILED
2014 Sep-22  PM 03:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLORIS HAWKINS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.:  2:12-cv-03922-RDP |
| | } | |
| BBVA COMPASS BANCSHARES, INC., | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. # 22), which has been fully briefed. (Docs. # 23, 28, 29, 32, and 33).

I.      FACTS[1]

Plaintiff Charloris Isabel-Hawkins was hired by Defendant on or about August 15, 2011 as a Financial Analyst III in the Finance Technology (TeSS) group.  (Doc. # 22-1 at pp. 26, 28-29).  Denis Arauz, Director of Financial Analysis & Planning – TeSS, made the decision to hire Plaintiff and was Plaintiff's immediate supervisor throughout her employment.  (Doc. # 22-1 at p. 33; Doc. # 22-5 at p. 42; Doc. # 22-10 at pp. 20-21).   Arauz, in turn, reported to Joanna Burleson, Director of TeSS Finance and Control. (Doc. $ 22-1 at p. 34; Doc. # 22-10 at pp. 12, 20).

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Defendant has a written Equal Employment Opportunity policy prohibiting any form of discrimination based on race, sex, sexual orientation, color, age, religion, national origin, veteran's status, disability or any other reason prohibited by law.  (Doc. # 22-2 at 16).   Its policy also prohibits any form of unlawful retaliation.  (Doc. # 22-2 at 28, 35).  At the beginning of her employment, Plaintiff received copies of Defendant's Employee Handbook and the Workplace Harassment Policy containing these policies.  (Doc. # 22-1 at pp. 37-40; Doc. # 22-2 at 37).

During Plaintiff's employment with Defendant, Arauz directly supervised three Financial Analysts in addition to Plaintiff:  Tiara Love, whom he later promoted to Finance Manager; Remy Bukelis; and Michael Langan.  (Doc. # 22-5 at pp. 33-34, 35-36, 39-40; Doc. # 22-1 at pp. 33-34, 35).

Arauz and his subordinates were responsible for variance analyses and forecasting for the TeSS (Technology Services & Solutions) Division.   For example, they compared divisional budgets with actual expenses, explained the reasons for any variances between the two, and forecasted anticipated expenses for the coming months and years in light of actual expenses. (Doc. # 22-5 at pp. 29-30, 75-81).  To accomplish these tasks, Arauz and his subordinates were required to coordinate their variance analyses and forecasts with executives and managers within the various subgroups of TeSS.  (Doc. # 22-5 at p. 30).  Generally, Plaintiff was responsible for variance analysis and budget forecasting for the design and development subgroup, including expenses for the group responsible for bank-specific software applications.  (Doc. # 22-5 at pp. 82-83).

From early on in Plaintiff's employment with Defendant, both Arauz and Plaintiff's co-worker, Tiara Love, perceived that Plaintiff struggled with the accurate, efficient, and timely

2

completion of her job assignments.  (Doc. # 22-16 at ¶ 3; Doc. # 22-15 at ¶¶ 1-2).  The Rule 56 file shows that there were other concerns.

On December 20, 2011, Arauz issued Plaintiff a Verbal Warning for accumulating four occurrences of absence within a 12-month period, as set forth in the Bank's attendance policy. (Doc. # 22-1 at pp. 41, 46-47; Doc. # 22-2 at 38).  The following day, although Plaintiff had actually accumulated these four absences in the first four months of her employment, she challenged the Verbal Warning with Corie Arnold in Defendant's Human Resources department. Plaintiff claimed that she had advance approval for one of the absences and requested that the verbal warning be removed.  (Doc. # 22-1 at pp. 50-51; Doc. # 22-2 at 39).  During this meeting, Plaintiff also complained to Arnold that Arauz used inappropriate language and, by way of example, asserted that in a meeting he stated that he was not going to follow up with someone by saying, "hey, so and so, where's my shit?" (Doc. # 22-2 at 39).  Plaintiff further complained that Arauz had discussions with her that she perceived as "belittling" or "degrading." She stated that although she asked questions because is new to the bank, Arauz did not provide her with the answers or assistance she was seeking.  (Doc. # 22-2 at 39).

On or about January 13, 2012, Plaintiff again complained to Human Resources, this time to her primary Human Resources contact, HR Partner Crystal Berryhill.  (Doc. # 22-1 at pp. 67-68; Doc. # 22-11at pp. 25-26).  Plaintiff complained that Arauz was "harsh" and "disrespectful" in his communications; "she has asked for help and training, but that he does not communicate with her or acknowledge her requests until he reprimands her about something she has done wrong;" and he uses profanity.   (Doc. # 22-2 at pp. 40-41; Doc. # 2-11 at p. 26).

3

Berryhill asked Plaintiff to provide the details of her complaint in writing, which Plaintiff did via e-mail.  (Doc. # 22-2 at 41).  Plaintiff complained that Arauz was harsh in his communications with her, used profanity in staff meetings and on the work floor, and she feared for her job.  (Doc. # 22-2 at 41; Doc. # 22-1 at p. 90).

In late January 2012, Plaintiff, Burleson and Arauz met to discuss the issues about which Plaintiff had previously complained.  (Doc. # 22-1 at pp. 98-99; Doc. # 22-2 at 41).  Berryhill summarized this meeting by stating that the issues Plaintiff raised are resolved, and noted Plaintiff will reach out to HR again, if needed.  (Doc. # 22-2 at 41).

Plaintiff testified that, after she complained to HR in January 2012, Arauz commented to her, "I'm tired of defending myself to Joanna [and] HR about whether or not I said something to you." (Doc. # 22-1 at p. 102; Doc. # 22-6 at 43).

On April 27, 2012, Arauz issued Plaintiff her annual performance evaluation for 2011 and his performance expectations for her for 2012.  (Doc. # 22-3 at pp. 47-53).  Because Plaintiff had only been employed for a few months by the end of 2011, Arauz rated her overall performance as "Meeting Expectations," rather than rating her lower based on performance issues he had observed to that point.  (Doc. # 22-5 at p. 112; Doc. # 22-16 at ¶ 4).  However, in the evaluation and expectations sections of Plaintiff's evaluation, Arauz addressed Plaintiff's performance to date (*i.e.*, as of April 2012):

**2011 PERFORMANCE EVALUATION**

<u>Performance Effectiveness</u>:  Charloris, when focused, the task is clear, and there is enough time, she will get the task at hand accomplished.  When the inverse occurs – time constraints, ambiguous details, and potential problems or conflicts, she is less effective.  Given that we are under a lot of time constraints and we need to manage both an expense view and capital view, there will be many times where ambiguity and lack of time will create uncomfortable situations.  It is

4

during this time that Charloris needs to determine what is lacking to ensure the task gets done. While management can help with various road blocks, Charloris needs to understand her business area and ensure that financials are accurately represented.

<u>Commitment</u>: Charloris is committed to doing a good job. I have seen the potential, however, it is not consistent. Commitment and performance effectiveness go hand in hand, hopefully as she improves her business acumen and understanding of all of her financials. I have no doubt that this will be improved in 2012.

<u>Teamwork</u>: Charloris has effective teamwork within the TyO Finance Group, however while some effort is placed for teamwork outside of TyO Finance, there is a communication breakdown that occurs.   Have been involved in multiple occasions where things were to a point of no return and communication was stalled. While this is the role of a manager to get involved, I do not have this level of intervention or severity within TyO Finance nor have I heard of instances in any of the other groups. Charloris should continue to work on this as it is critical to achieving overall success.

(Doc. # 22-3 at p. 49; Doc. # 22-5 at pp. 107-08; Doc. # 22-1 at p. 107). In the evaluation, Arauz also listed in detail his expectations of Plaintiff's performance for 2012 and provided her with a list of "next steps" that she needed to take in the following months to improve her performance. (Doc. # 22-3 at pp. 50-51).

During 2012, Arauz perceived Plaintiff to have continuing performance issues. (Doc. # 22-16 at ¶ 5; Doc. # 22-10 at pp. 45-49, 53-54, 55). On May 10, 2012, Naccari and Arauz decided to issue a written warning to Hawkins due to her performance. However, the written warning was not delivered to Hawkins until approximately 43 days later, on June 22, 2012. (Doc. # 22-5 at pp. 118; Doc. # 29-10). After it had been determined that the warning would be issued, but before it was completed, Plaintiff bid on two accounting positions. (Doc. # 29-13). Plaintiff was told she could continue to bid on these positions, and that Arauz would not block the bids but, if asked, he would explain she had received a written warning. (Doc. # 29-19).

5

Plaintiff left work sick on June 22, 2012, the date she received the written warning. She reported suffering a pseudo seizure, and was off work until June 27, 2012. (Doc. # 22-1 at pp. 115-16, 205-06). Plaintiff claims that, thereafter, Arauz's treatment was "more hostile than before." (Doc. # 22-1 at pp. 116, 205-06). But she also characterizes it as the same type of treatment which she claims she was subjected to throughout her employment. (Doc. # 22-1 at 205-6).

Plaintiff responded to the June 22, 2012 warning by blaming Arauz for her performance issues. She asserted that he had not provided her with what she considered to be adequate guidance and assistance, and claimed that he was a poor communicator. (Doc. # 22-1 at pp. 111-12, 121-23; Doc. # 22-2 at 41;Doc. # 22-3 at 60-61; Doc. 22-4 at pp. 2-7). Plaintiff further stated that she believed Arauz was retaliating against her because she had complained about him to the HR department. (Doc. # 22-11 at pp. 48-49).

In a June 27, 2012 memorandum to Arauz, Plaintiff complained that she was "treated differently from other employees." (Doc. # 22-1 at pp. 125, 126; Doc. # 22-3 at 59-61). However, importantly, the memo does not identify or make specific reference to the gender of the "other employees" from whom she believed were being treated differently. (Doc. # 22-1 at pp. 128-29; Doc. # 22-3 at 60-61).

On July 2, 2012, Arauz, Berryhill, Naccari, and Plaintiff met to discuss the various issues between Plaintiff and Arauz. (Doc. # 22-1 at pp. 143-44; Doc. # 22-2 at 43; Doc. # 22-11 at pp. 49-51; Doc. # 22-10 at p. 29). Three days later, these same individuals met again, along with Tameka Eubanks, a Senior HR Partner who was assigned to temporarily serve as Plaintiff's primary HR partner due to Berryhill's impending maternity leave. (Doc. # 22-11 at pp. 71-73;

Doc. # 22-13 at p. 25).  During that meeting, Arauz issued Plaintiff a detailed memo setting forth her job responsibilities, reiterating her self-professed job qualifications (as set forth on her resume), and established a task-specific and time-specific plan of action, in order to eliminate confusion as to what was expected of Plaintiff going forward.  (Doc. # 22-16 at ¶ 5; Doc. # 22-4 at 8-13).

In addition, during the July 5 meeting, it was agreed that Arauz and Plaintiff would meet in person -- on at least a weekly basis -- to discuss whatever issues needed to be addressed, and to avoid any miscommunication via e-mail. (Doc. # 22-1 at p. 162).  Although Plaintiff claims that the majority of these one-on-one meetings were canceled by Arauz (Doc. # 22-1 at pp. 162-63), in the memorandum subsequently issued to her at the time of her probation, Arauz set forth in detail the dates, times, and topics of seventeen such meetings, some of which lasted as long as two hours at a time.  These seventeen meetings occurred during the approximately four week period between the July 2 meeting and Plaintiff's subsequent August 6 probation. (Doc. # 22-4 at 18-22).

On July 11, 2012, a month prior to her one-year anniversary with Defendant, Plaintiff first inquired with Berryhill about taking FMLA leave.  (Doc. # 22-11 at p. 43-44).  Berryhill referred Plaintiff to Defendant's leave department and did not mention Plaintiff's inquiry to anyone else.  (Doc. # 22-11 at p. 44).  Arauz did not become aware that Plaintiff had applied for FMLA leave until August 30, 2012, three weeks *after* her last day of work prior to taking leave. (Doc. # 22-5 at pp. 193-94; Doc. # 22-7 at 26).

After the seventeen meetings with Plaintiff in July and August, Arauz ultimately concluded that Plaintiff simply did not possess the level of skill or experience she had claimed

when applying for the job and that her shortcomings in this respect were not reasonably solvable given the time-sensitive constraints of the position. (Doc. # 22-16 at ¶ 6). In an August 6, 2012, memorandum to Burleson and Dan Howard, Personal HR Partner and Senior Vice President, who recently had replaced Naccari as Arauz's primary HR contact, Arauz stated his belief that Plaintiff's employment should be terminated. Alternatively, he stated that he would "like HR to find her a new home," and asked HR to manage her bid request process. (Doc. # 22-5 at pp. 177, 196-98, 200-02; Doc. # 22-7 at p. 28; Doc. # 22-8 at pp. 44, 61, 73-74).

After reviewing the situation, Howard, with input from Arauz, Burleson and Eubanks, determined that Plaintiff would be placed on probation. (Doc. # 22-8 at pp. 65-66, 68-69). Accordingly, on August 6, 2012, Plaintiff was placed on ninety day probation for unsatisfactory performance. (Doc. # 22-4 at 17-22; Doc. # 22-1 at pp. 158-61; Doc. # 22-5 at pp. 176-77; Doc. # 29-24). The probationary warning stated that it was "imperative that [she] demonstrate immediate, significant, and sustained improvement" and that "[f]ailure to meet these standards of performance can result in further disciplinary counseling, up to and including termination of employment." (Doc. # 29-24). On August 7, 2012, Plaintiff submitted a five-page "written rebuttal" to her probation document claiming the probation was retaliatory, denying that her the performance issues were her responsibility, and claiming critical information was being withheld from her. (Doc. # 22-4 at p. 23-27).

Immediately after she was placed on probation, Plaintiff was given a narrowly-tailored software maintenance file assignment, which she agreed could be completed and submitted no later than August 9, 2012. (Doc. # 22-1 at pp. 173-74; Doc. # 22-5 at pp. 204-05; Doc. # 22-8 at p. 75). Plaintiff submitted the assignment on the morning of August 9, and that afternoon left

work for medical reasons.  (Doc. # 22-1 at p. 175; Doc. # 22-5 at pp. 205-06; Doc. # 22-8 at p. 79).

Plaintiff subsequently requested (and was approved for) non-FMLA medical leave and, once she had satisfied the minimum one year of employment eligibility requirement as of August 15, 2012, applied for and was approved for FMLA leave.  (Doc. # 22-1 at pp. 176-77; Doc. # 22-4 at 28-30).

While Plaintiff was on leave, Arauz reviewed the assignment she had submitted just prior to her departure and determined that it contained several of the same types of errors she had been repeating throughout her employment.  (Doc. # 22-5 at pp. 205-06; Doc. # 22-16 at ¶ 9; Doc. # 22-8 at pp. 86-87).   Arauz discussed his conclusions with Howard, who asked if he (Arauz) thought that Plaintiff could turn her performance around.  Arauz replied that he "didn't think so." (Doc. # 22-5 at pp. 200-03).

To ensure that Arauz was reasonably assessing Plaintiff's performance and that her inability to complete the assignment was not based on information inaccessible to her or available only through Arauz, Howard provided the same assignment to another financial analyst, Robby Odgers, to determine if he could complete the assignment as provided. (Doc. # 22-8 at pp. 75-76, 89-90; Doc. # 22-17 at ¶ 4; Doc. # 22-1 p. 182).  In addition, Howard provided the results reached by Plaintiff (obviously without identifying Plaintiff as the creator) to Odgers to see if he could determine how Plaintiff had achieved her results.  (Doc. # 22-17 at ¶ 4 and at pp. 6-9).

Odgers confirmed Arauz's assessment that Plaintiff's reports were inaccurate, internally inconsistent and appeared to be prepared by someone who lacked the necessary analytical skills.

9

(Doc. # 22-17 at ¶ 4 and at pp. 6-9).  Therefore, Howard decided to meet with Plaintiff upon her return from leave to allow her an opportunity to provide an explanation regarding her failure to properly complete the assignment.  (Doc. # 22-13 at pp. 63-65; Doc. # 22-8 at pp. 75-76).

On September 11, 2012, Plaintiff was released by her treating physician to return to work on a reduced schedule for two weeks, with no restrictions thereafter.  (Doc. # 22-1 at pp. 180-81).  Upon Plaintiff's return to work, Howard and Eubanks met with her and questioned her regarding the assignment she turned in just before her leave.  (Doc. # 22-1 at pp. 178-79, 181-82, 185, 188-89; Doc. # 22-8 at pp. 93, 99-100; Doc. # 22-13 at pp. 65, 67; Doc. # 22-4 at pp 31-40).  As Plaintiff admits, during the post-leave meeting with Howard and Eubanks on September 11, 2012, neither of them made any inappropriate reference to her having taken FMLA leave. (Doc. # 22-1 at p. 182).

After the meeting, Howard concluded that Plaintiff's performance issues were not readily resolvable and decided to terminate her employment for unsatisfactory performance. (Doc. # 22-8 at pp. 58-59, 77, 101, 116; Doc. # 22-13 at pp. 68, 69-70).  The decision to terminate Plaintiff's employment had not been made prior to this meeting.  (Doc. # 22-13 at pp. 67-68).  On September 12, 2012, Howard and Eubanks met with Plaintiff again to inform her of the termination decision.  (Doc. # 22-1 at pp. 187-88, 189; Doc. # 22-8 at pp. 73-74; Doc. # 22-13 at p. 68; Doc. # 22-4 at pp 31- 40).  After Plaintiff's termination, a current employee, Chris Valencia, and a contract employee, Matthew English assumed her duties.  (Doc. # 29-13 at 4).

On November 20, 2012, Plaintiff filed a charge of discrimination with the EEOC, alleging she was discharged because of her gender.  She also asserted that she was subjected to a

retaliatory discharge, both in violation of Title VII, as well as the Family and Medical Leave Act (FMLA) (Doc. # 22-2 at 5-6).

As evidence of Arauz's alleged discriminatory intent, Plaintiff points to several events. First she testified that, on one occasion in November or December 2011, Arauz stated that she must have "mommy brain." (Doc. # 22-1 at p. 87).  She further testified that, on another occasion, when a contract employee made what Plaintiff believes was a joke in Spanish, followed by a hand gesture mimicking male masturbation, Arauz only apologized for the contractor's behavior, and did not "t[ake] the contractor to task."  (Doc. # 22-1 at pp. 92-97). She also testified that, on "probably five to six" occasions, she heard Arauz refer to his boss, Burleson, and a peer, Ada Yu, as "bitches."  She believes that Arauz called her a bitch on one occasion.  (Doc. # 22-1 at pp. 53, 77).  Plaintiff cannot recall when these other incidents occurred.  (Doc. # 22-1 at p. 54).

Plaintiff also found Arauz's comment to her that, "You've been here 55 days, you should know that" offensive, as well as his comment in her presence, "Are you f****** kidding me?" (Doc. # 22-1 at p. 55).  Plaintiff gave the following examples of what she perceived as "degrading" or "belittling" behavior by Arauz: he "got up and stormed out" of one meeting; occasionally, he would not respond to a question or would respond in a sarcastic manner; and on one occasion on the production floor (*i.e.*, in the walkway between the open-air office cubicles) he responded to her question by saying, "I've given it to you.  I'm not going to do your work for me."  (Doc. # 22-1 at p. 58).  Plaintiff asserts that she never witnessed him make a similar comment to a male employee on the production floor.  (Doc. # 22-1 at pp. 57-58, 59).

In addition, in response to a lengthy e-mail from Plaintiff, Arauz responded, "This is a very long e-mail, this [is] how miscommunication starts and is an important enough topic to discuss during our one on one [meetings]."  Plaintiff described Arauz's response as Arauz as "brutal" or "harsh." (Doc. # 22-1 at pp.  83-84, 169-70; Doc. # 23-3 at 41; Doc. # 22-3 at 59-61; Doc. # 22-4 at pp 2- 7, 14-16, 23-27).

Plaintiff contends that Arauz gave Remy Bukelis more guidance than he provided her, and responded more favorably to questions from male co-workers Josh Sellers and Ben Blass than he did to her questions.  (Doc. # 22-1 at pp. 65-66, 225-26).  Plaintiff admits that she never witnessed Arauz mistreat Tiara Love in any way.  Doc. # 22-1 R p. 66).  It is undisputed that Arauz promoted Love.  (Doc. # 22-5 at p. 32).

As further evidence of Arauz's alleged gender bias, Plaintiff claims that he "bragged" about getting a different position for Bukelis.  (Doc. # 22-1 at pp. 145-47).  Plaintiff and Bukelis held the same position, although Plaintiff was paid more.  (Doc. # 22-5 at p. 34-35).  Eventually, Bukelis moved into another position.  Ada Yu, a controller, was looking to fill a position and Bukelis, a CPA, was looking to get back into accounting.  Arauz suggested Bukelis talk to people in accounting and asked Yu if she had considered Bukelis.  He interviewed, was offered the position and accepted it.  (Doc. # 22-5 at pp. 37-39).  Arauz had previously counseled Bukelis on being late on certain matters.  (Doc. # 22-5 at 139).  However, Bukelis did not have other performance problems.  (Doc. # 22-5 at 139).

Plaintiff similarly contends that Arauz helped Jorge Garza obtain a different position. (Doc. # 22-1 at pp. 148-50).  Arauz denies that he did anything to help Garza obtain a different job, but, in any event, Garza held a different position than Plaintiff – he was a Divisional Finance

Manager.   (Doc. # 22-5 at pp. 162-63).   Furthermore, Arauz had never written him up for any performance issues. (Doc. # 22-5 at pp. 162-63).

Josh Sellers is another employee who was allowed to transfer to a different position, but he never reported to Arauz.  (Doc. # 22-5 at p. 167; Doc. # 29-13).  Defendant has admitted that the approval of Sellers' move was an error.[2]  (Doc. # 29-13).  But the key differentiation is that Plaintiff reported to Arauz (and was not performing well), while Sellers did not report to Arauz (and therefore could not have performed poorly for Arauz).  (Doc. # 29-13).

Although Plaintiff asserts that Arauz treated Bukelis more favorably by allowing him extensions of time to complete assignments, Plaintiff admits that, rather than asking for extensions, she simply "stayed late and worked" and could not recall any occasion where Arauz denied an extension that she requested.  (Doc. # 22-1 at pp. 141-43).  Love testified that she recalled that Arauz approved a deadline extension requested by Plaintiff on at least one occasion. (Doc. # 22-15 at ¶ 3).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*,

---

[2] Plaintiff contends that Defendant admitted this was discriminatory, but that contention does not find any support in the Rule 56 record.  Rather, Naccari merely expressed her concern that, because his move was approved and Plaintiff's was not, it would *appear* discriminatory.  (Doc. # 29-13).

477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* id. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## III.    ANALYSIS

Plaintiff's First Amended Complaint states three claims: Count I – FMLA Retaliation; Count II – Title VII Sexual Discrimination (Disparate Treatment); and Count III – Title VII Retaliation.  (Doc. # 15; Doc. # 28 at 24).  After careful review and for the reasons stated below, the court concludes that there are no material issues of fact in this case and that Defendant is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56.  The court will address the claims in the same order that the parties have addressed them: Plaintiff's claim of sex discrimination contained (in Count II); Plaintiff's claim of Title VII retaliation contained (in Count III); and Plaintiff's claim of FMLA retaliation contained (in Count I).

### A.      Count II - Title VII Sex Discrimination

A  Title VII disparate treatment claim based on circumstantial evidence is analyzed under

14

the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). To establish a prima facie case of disparate treatment, the plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Once a prima facie case is established, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087.  This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co*., 698 F.2d 1138, 1141 (11th Cir. 1983). So long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Texas Dept. of Community Affairs v. Burdine*, 450 248, 254-55 (1981). After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason, but must "meet that reason head on and rebut it." *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000).

### 1.  Plaintiff's Termination is the Only Actionable Adverse Employment Action She Has Raised

The Eleventh Circuit has held that "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment

action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis added).

Interestingly, Plaintiff's Opposition Brief never clearly sets forth what adverse employment actions are at issue under Plaintiff's disparate treatment claim.  Under the section addressing adverse employment actions subject to that claim, she argues that Arauz "*retaliated* against her in the form of: 1) putting a written warning in her file; 2) putting her on probation; 3) blocking her ability to transfer to another position outside of his supervision; and 4) instigating her termination."  (Doc. # 28 at 26).  This is an important point because, as the Eleventh Circuit has noted, the definition of adverse employment action in the context of a retaliation claim is much broader than that applicable to a discrimination claim.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008).  "An employment action is considered sufficiently 'adverse' to be actionable under federal discrimination statutes 'only if it results in some *tangible, negative effect* on the plaintiff's employment.'"  *Andazola v. Logan's Roadhouse Inc.,* 871 F.Supp.2d 1186, 1206-7 (N.D. Ala. 2012) (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (addressing an ADA retaliation claim) (emphasis supplied).  Here, there is insufficient evidence from which a reasonable jury could conclude that Plaintiff suffered any serious reduction in pay, responsibilities, or prestige with respect to any decision other than her discharge and related probation status.[3]

---

[3] Plaintiff argues that she was blocked from bidding on other positions and that this action constituted an adverse employment action.  However, an unwanted transfer, unless it is accompanied by a reduction in pay or responsibility, is not actionable.  *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1453 & n. 21 (11th Cir. 1998) ("It is important not to make a federal case out of a transfer that is *de minimis*, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint."). Therefore, the failure to allow such a transfer certainly does not constitute a serious and material *change* because there is no change.

**2.      There is No Evidence of Similarly Situated Comparators in the Rule 56 File**

Even if the court were to allow Plaintiff to assert a disparate treatment claim on decisions other than her discharge, she cannot establish a prima facie case by pointing to a comparator. The employees whom a Title VII plaintiff identifies as comparators must be similarly situated in all relevant respects. *Wilson,* 376 F.3d at 1091; *Holifield*, 115 F.3d at 1562. The Eleventh Circuit has held this to mean that "[t]he comparator must be nearly identical to the plaintiff." *Wilson*, 376 F.3d at 1091; *Mannicia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia*, 171 F.3d at 1368 (quotations omitted). Thus, we require "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not "similarly situated" for purposes of establishing a prima facie case. *See, e.g., Knight v. Baptist Hosp. of Miami, Inc*., 330 F.3d 1313, 1316-19 (11th Cir. 2003) (the employee and comparator who committed the same act were not similarly situated because the comparator's overall record was better).

The closest Plaintiff comes to presenting sufficient comparator evidence relates to Remy Bukelis. But even that so-called comparator evidence falls far short of the mark. Plaintiff and Remy Bukelis held the same position and were both supervised by Arauz. Interestingly, Plaintiff was paid more (Doc. # 22-5 at p. 34-35)). Although Plaintiff presented evidence that Arauz had previously counseled Bukelis on being late on certain matters (Doc. # 22-5 at 139), she has not

presented any evidence that Bukelis suffered from any other performance problems.  (Doc. # 22-5 at 139).  And while Plaintiff contends that Arauz treated Bukelis more favorably by allowing him extensions of time to complete assignments, she admits Arauz never denied her any extension that she requested.  (Doc. # 22-1 at pp. 141-43).  In fact, Love testified that she recalled at least one occasion where Arauz approved a deadline extension requested by Plaintiff. (Doc. # 22-15 at ¶ 3).

Plaintiff asserts that Jorge Garza and Josh Sellers are also comparators.  Garza is not an appropriate comparator because he held a completely different position than Plaintiff – he was a Divisional Finance Manager.  (Doc. # 22-5 at pp. 162-63).  Moreover, Arauz had never written Garza up for any performance issues. (Doc. # 22-5 at pp. 162-63). Sellers was not supervised by Arauz (Doc. # 22-5 at p. 167; Doc. # 29-13), and Plaintiff's arguments about Sellers ignore the point that employees with different supervisors are not adequate comparators. *Galdamez v. DHL Air Exp. USA,* 2014 WL 4178198, * 3 (11th Cir. 2014) (citing *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001) (stating that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination," but ultimately declining to address the underlying discrimination claim); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312 n. 7 (11th Cir. 1998) superseded in other part by, 151 F.3d 1321 (11th Cir. 1998); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989)).

Plaintiff has presented no evidence that any alleged comparator had performance problems similar to hers.  Plaintiff simply disputes that she had performance problems and claims her inability to adequately perform her job was related to her alleged inability to obtain needed information.  Plaintiff further contends that it was clear she had no performance issues

18

because she received a "meeting expectations" rating on her April 2012 review. But the undisputed evidence shows that Plaintiff received this rating on her 2011 performance because she had only been employed for a few months at the time. In fact, even in that evaluation, Arauz made observations regarding deficiencies in Plaintiff's performance when he set forth his expectations in the text of the review. (Doc. # 22-3 at p. 49; Doc. # 22-5 at pp. 107-08; Doc. # 22-1 at p. 107). It follows that Plaintiff cannot establish a prima facie case of discrimination on anything other than her discharge claim.

As to Plaintiff's termination claim, she has presented evidence which is sufficient to establish a prima facie case. In order to establish a prima facie case for discriminatory termination, a plaintiff may show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class. *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). After Plaintiff's termination, a male employee, Chris Valencia, and a male contract employee, Matthew English, assumed her duties. (Doc. # 29-13 at 4).[4] Accordingly, the court will evaluate Defendant's articulated reason for discharging Plaintiff.

### 3.   Defendant's Legitimate, Non-discriminatory Reasons

Defendant has carried its "exceedingly light" burden of articulating legitimate, non-discriminatory reasons for Plaintiff's termination. Plaintiff was placed on probation due to errors and poor performance. The probationary warning stated that it was "imperative that [she]

---

[4] Although the assumption of duties by an existing employee may not constitute a "replacement," the hiring of a male contract employee is sufficient to establish that Plaintiff was replaced by a male. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 318 (6th Cir. 2007) (holding that the fourth element of the prima facie case is satisfied "even where the new hire, who is a member of the non-protected class, has the title of 'temporary' employee"; "merely designating the new hire 'temporary' will not defeat the fourth element"); *Williams v. Ala. Dept. of Transp.*, 509 F.Supp.2d 1046, 1054-55 (M.D.Ala. 2007) (finding a factual dispute as to the fourth prong where the defendants classified the replacement employee as temporary).

demonstrate immediate, significant, and sustained improvement" and that "[f]ailure to meet these standards of performance can result in further disciplinary counseling, up to and including termination of employment."  (Doc. # 29-24).  Immediately after being placed on probation, Plaintiff was then given a narrowly-tailored software maintenance file assignment, which she agreed could be completed and submitted no later than August 9, 2012.  (Doc. # 22-1 at pp. 173-74; Doc. # 22-5 at pp. 204-05; Doc. # 22-8 at p. 75).  Plaintiff submitted the assignment on the morning of August 9, and promptly left work for medical reasons.  (Doc. # 22-1 at p. 175; Doc. # 22-5 at pp. 205-06; Doc. # 22-8 at p. 79).

When Arauz reviewed the assignment, he determined that it contained several of the same types of errors she had been repeating throughout her employment.  (Doc. # 22-5 at pp. 205-06;Doc. # 22-16 at ¶ 9; Doc. # 22-8 at pp. 86-87).  To ensure that Arauz was reasonably assessing Plaintiff's performance, and that her inability to complete the assignment was not based on information inaccessible to her or available only through Arauz, Howard provided the same assignment to another financial analyst within the Bank to determine if he could complete the assignment as provided. (Doc. # 22-8 at pp. 75-76, 89-90; Doc. # 22-17 at ¶ 4; Doc. # 22-1 p. 182).  The other analyst confirmed Arauz's assessment that Plaintiff's reports were inaccurate, internally inconsistent, and appeared to be prepared by someone who lacked the necessary analytical skills to do the work.   (Doc. # 22-17 at ¶ 4 and at pp. 6-9).

### 4.    Plaintiff Has Not Shown that Defendants' Reasons are a Pretext for Discrimination

Because Defendant satisfied its burden of production of a legitimate, non-discriminatory reason for Plaintiff's termination, Plaintiff is required to come forward with evidence sufficient to permit a reasonable fact finder to conclude that the reasons Defendant gave were pretextual.

*Burdine*, 450 U.S. at 253. Plaintiff may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." S*pringer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348-1350 (11th Cir. 2007).   Importantly, conclusory allegations of discrimination, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co*., 101 F.3d 1371, 1376 (11th Cir. 1996). Moreover, "[a] reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006).

In order to show pretext, a plaintiff may not merely quarrel with the wisdom of the employer's reason, but must meet the reason head on and rebut it.  *See Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1264 (11th Cir. 2010); *Chapman v. Al Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000).   That is, the inquiry into pretext is based on "the employer's beliefs, and not the employee's own perceptions of [her] performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). As our Circuit has explained, "to be blunt about it," the inquiry does not center "on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1266 (11th Cir. 2010) (explaining that the question is not whether the employee actually had performance problems, but "whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints ... as cover for" discrimination).

As to her performance, Plaintiff simply argues that she was not given sufficient information and guidance by Arauz.  But Arauz was not the only one to perceive Plaintiff's performance deficiencies.  Tiara Love also concluded that Plaintiff struggled with accurately, efficiently, and timely completing her job assignments.  (Doc. # 22-15 at ¶¶ 1-2).  Indeed, Plaintiff asked Love for assistance so frequently, it began to impact Love's ability to do her own job.  (Doc. # 22-15).  After Plaintiff was placed on probation and turned in an assignment in which she made several errors of the same type she had been repeating throughout her employment, Howard provided the same assignment to another financial analyst within the Bank to determine if he could complete the assignment as provided. (Doc. # 22-8 at pp. 75-76, 89-90; Doc. # 22-17 at ¶ 4; Doc. # 22-1 p. 182).  The other analyst confirmed Arauz's assessment that Plaintiff's reports were inaccurate, internally inconsistent, and appeared to be prepared by someone who lacked the necessary analytical skills.    (Doc. # 22-17 at ¶ 4 and at pp. 6-9). Plaintiff does nothing more than quarrel with this assessment of her performance, and (perhaps alternatively) blames her deficiencies on a lack of information.   That response is simply insufficient to create a genuine issue of fact as to pretext.

This court does not sit as the Human Resources Director for the Northern District of Alabama.  In fact, the court has been specifically instructed by the court of appeals not to be concerned with whether an employment decision is prudent or even fair, but only if it was motivated by unlawful animus.  To be sure, an employer may fire an employee for a reason based on erroneous facts, an unfair reason, or for no reason at all, so long as the employment action is not taken for a discriminatory reason. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  Because Plaintiff has failed to establish that the reasons

stated for her termination were a pretext for sex discrimination, Defendant is entitled to summary judgment on her disparate treatment claim.

## B.       Title VII Retaliation

Plaintiff's retaliation claim appears to be based not only on her probation and termination, but also on Arauz allegedly blocking her ability to transfer to another position. (Doc. # 28 at 29-30).  She argues that she made numerous complaints of discrimination during her employment.  But her argument does not attempt to tie those general complaints to any particular employment action.  (Doc. # 28 at 29-31).  Rather, she focuses on her August 7, 2012 written rebuttal to her probation document and her subsequent termination.  (Doc. # 29-27).  She asserts that this written rebuttal constitutes protected conduct because she specifically complains that she was being subjected to a "hostile work environment" and "retaliation."  (Doc. # 29-27 at 5).[5]

### 1.       Plaintiff Failed to Establish a Prima Facie Case of Retaliation

To establish a Title VII retaliation claim based on circumstantial evidence, Plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) there is a causal connection between the two events. *See Crawford*, 529 F.3d at 970; *see also Dixon v. The Hallmark Cos., Inc.,* 627 F.3d 849, 854 (11th Cir. 2010); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

The definition of adverse employment action in the context of a retaliation claim is broader than that applicable to a discrimination claim.  A materially adverse action "means it

---

[5] Although it is clear that Plaintiff complained about Arauz numerous times during her employment, it is not clear that any of the prior complaints alleged unlawful gender discrimination.  *See, e.g.* Doc. # 22-2 at 39, 41; Doc. # 22-3 at 60-61).  Even the August 7, 2012 letter is not clear on this point.  Although it asserts Plaintiff was subjected to a "hostile working environment" it does not assert that the hostility was based on any protected category.  (Doc. # 29-27).

well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Crawford*, 529 F.3d at 974.  To establish the second element referenced above, the employee must show that "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co*., 548 U.S. at 68.

Plaintiff asserts that she engaged in protected conduct on August 7, 2012, when she sent her memorandum to Eubanks and Howard in an attempt to rebut the rationale behind her probation.  In response, Defendant argues that this does not constitute protected activity because it does not mention gender discrimination specifically.  To a certain extent, Defendant is correct.  Courts have made clear that general complaints about unfair treatment do not amount to protected activity under Title VII. *See Boyland v. Corrections Corp. of Am*., 390 Fed. Appx. 973, 978 (11th Cir. 2010) (unpublished) ("'Unfair treatment, absent discrimination based on [a Title VII protected category], is not an unlawful employment practice under Title VII.'") (quoting *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995)).  Nonetheless, the court will assume without deciding that the August 7, 2012 memo constitutes protected conduct.  After all, the memorandum does allege the existence of a "hostile work environment" and "retaliation."  (Doc. # 29-27).  Thus, as to her termination, Plaintiff has presented evidence on the first two elements of her prima facie case: protected conduct and an adverse employment action.[6]  But that is as far as the undisputed facts carry her.

Plaintiff's claim fails on the element of causation.  As the Supreme Court observed in *University of Texas Southwest Medical Center v. Nassar*, 133 S.Ct. 2517, 2533 (2013), "Title VII

---

[6] Plaintiff was placed on probation before the memorandum was written, so it cannot suffice to establish a prima facie case as to Plaintiff's probation.

retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e−2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or action of the employer." *Id*. In other words, a plaintiff making a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534.

The undisputed evidence shows that Plaintiff was placed on probation on August 6, 2012. In the probation document, she was warned that it was "imperative that [she] demonstrate immediate, significant, and sustained improvement" and that "[f]ailure to meet these standards of performance can result in further disciplinary counseling, up to and including termination of employment."  (Doc. # 29-24).   On August 7, 2012, she submitted her written rebuttal to her probation document in which also complained of "a hostile work environment" and "retaliation." (Doc. # 29-27).  On August 9, 2012, Plaintiff turned in a project which contained several errors of the same type she had been repeating throughout her employment.  (Doc. # 22-5 at pp. 205-06; Doc. # 22-16 at ¶ 9; Doc. # 22-8 at pp. 86-87).   To be doubly sure this was a failure to adequately perform situation, Howard double checked the work Plaintiff did on the task by having another financial analyst complete the project.  (Doc. # 22-8 at pp. 75-76, 89-90; Doc. # 22-17 at ¶ 4; Doc. # 22-1 p. 182).   The other analyst, who did not know that Plaintiff had originally been assigned the task, confirmed that Plaintiff's reports were inaccurate, internally inconsistent, and appeared to be prepared by someone who lacked the necessary analytical skills to do the job.   (Doc. # 22-17 at ¶ 4 and at pp. 6-9).  Plaintiff's September 12, 2014, termination was based on this poorly performed task which was submitted after Plaintiff was placed on

probation and warned that failure to improve her performance could result in termination.  Based on these undisputed Rule 56 facts, Plaintiff has failed to demonstrate the requisite "but-for" causation to establish a prima facie case on her retaliation claim.

### 2. Plaintiff Has Not Established That Defendant's Reason Was Pretextual

Even if Plaintiff had presented sufficient evidence of causation to establish a prima facie case of retaliation (and, to be clear, she has not), for the reasons discussed above, she has failed to establish evidence of pretext.  That is, she has not presented evidence showing that Defendant's stated reason for her termination was not the real reason for her termination and that it was a pretext to hide a discriminatory or retaliatory motive.  *See* Section III(A)(3) above.

Plaintiff has offered only conclusory allegations of pretext in her attempt to rebut the Defendant's non-retaliatory reasons for her termination.  "A plaintiff is not allowed to recast an employer's proffered non[retaliatory] reasons or substitute his business judgment for that of the employer."  *Chapman*, 229 F.3d at 1030.  Nor can she insulate herself against termination or discipline by preemptively making a discrimination complaint.  *Alvarez*, 610 F.3d at 1270.  Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### C. FMLA Retaliation

The FMLA creates two types of claims: (1) interference claims, in which an employee asserts that her employer denied or otherwise interfered with her substantive rights under the Act; and (2) retaliation claims, in which an employee asserts that her employer discriminated against her because she engaged in activity protected by the Act. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (quotations and citation omitted); *see also* 29 U.S.C. § 1615(a)(1), (2).

Plaintiff argues that she has stated both an FMLA interference claim and a retaliation claim. Defendant argues she has only stated a retaliation claim. Prior to becoming eligible for FMLA leave, Plaintiff requested and was approved for non-FMLA medical leave. Thereafter, once she was eligible for FMLA leave, she applied for and was approved for FMLA leave. (Doc. # 22-1 at pp. 176-77; Doc. # 22-4 at 28-30). After her full-time leave ended, she returned to work in her same position on a reduced leave basis, but was terminated the same day for prior performance issues.

Plaintiff claims that Defendant denied her the right to return to her position and continue on reduced schedule FMLA leave working twenty hours per week. Plaintiff takes issue with the fact that the decision to terminate her employment was made while she was on FMLA leave, and therefore, she did not have a job to continue on her reduced schedule leave. "However, the fact that Defendant decided to terminate Plaintiff while [s]he was on FMLA leave does not save Plaintiff's claim, because Defendant's reason for terminating Plaintiff … was not related to [her] taking FMLA leave, and Plaintiff has not shown that Defendant's proffered reason was mere pretext." *Carroll v. Ceridian Benefits Services,* 2012 WL 5431007 *11 (M.D. Fla. 2012) (citing *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir. 2010).

To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001). The employee need not allege that his employer intended to deny the benefit, because "the employer's motives are irrelevant." *Id.* at 1208. Plaintiff argues she was entitled to continue her reduced schedule FMLA leave, a benefit which was denied her.

In *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010), in the context of a FMLA interference claim, the Eleventh Circuit addressed whether the right to commence FMLA leave is absolute. The *Krutzig* court held that "the right to commence FMLA leave is not absolute, and that an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig,* 602 F.3d at 1236. Thus, Plaintiff's FMLA claims essentially merge into one claim which is virtually the same as her Title VII retaliation claim. Her claim sounds in retaliation, not interference.

"The prima facie case of retaliation under the FMLA is the same as under Title VII and requires a showing of (1) statutorily protected conduct, (2) adverse employment action, and (3) causation." *Penaloza v. Target Corp.,* 549 Fed.Appx. 844, 847-48 (11th Cir. 2013) (citing *Krutzig*, 602 F.3d at 1234-35). Under this claim, Plaintiff contends that she was terminated because she took FMLA leave. She further argues that she should have been allowed the full ninety days of her probationary period to improve her performance. However, her arguments ignore the fact that, after being told to exhibit immediate improve or face termination, she turned in another assignment containing more of the same types of errors she had been repeating throughout her employment. (Doc. # 22-8 at pp. 75-76, 89-90; Doc. # 22-17 at ¶ 4; Doc. # 22-1 p. 182).

As previously explained with respect to Plaintiff's Title VII retaliation claim, even if Plaintiff had satisfactorily demonstrated a causal connection between her request for FMLA leave and her termination, Defendant has proffered legitimate, non-discriminatory and non-retaliatory reasons for Plaintiff's termination. As discussed above, Plaintiff has failed to rebut

these reasons or show that they are a pretext for an unlawful motive.  Therefore, just like its Title VII counterpart, Plaintiff's FMLA retaliation claim necessarily fails.  Defendant is entitled to summary judgment on this claim.

## V.    Conclusion

For the foregoing reasons, Defendant is entitled to judgment as a matter of law on all of the claims asserted in Plaintiff's First Amended Complaint and Defendant's Motion for Summary Judgment is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this September 22, 2014.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE